IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 14-20130-JAR |
| ) | |
| DALEVON DIXON, et al. , ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM AND ORDER**
**GRANTING DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on Defendant Clark's Motion to Suppress (Doc. 64), which Defendant Heard joined (Doc. 126). On December 9, 2015, the Court held a hearing on those motions as well as Defendant Clark's Motion to Sever Counts (Doc. 62), which Defendant Heard also joined. The Court granted Defendants' motion to sever and heard evidence on the suppression motion. The matter went under advisement at the conclusion of the hearing, but on December 14, 2015, the Government filed a Motion to Reopen the Suppression Hearing (Doc. 130), to which Defendant Clark responded in opposition on December 18, 2015 (Doc. 133), and Defendant Heard responded on December 21, 2015 and December 22, 2015 (Docs. 134, 136, 137). As explained more fully below, the Court determines that the evidence the Government wishes to introduce in a reopened suppression hearing would not affect the Court's decision on Defendants' motion. The motion to reopen the hearing is therefore moot. Having reviewed the evidence and arguments presented by the parties, the Court is now prepared to rule on Defendants' suppression motion. The Court will suppress the marijuana and firearms discovered by the officers because Defendants were unlawfully seized before the officers conducted the search, there is a factual nexus between the unlawful detention and the search, and the

Government has failed to meet its burden to show that the search was not the fruit of the unlawful detention.

**I.     Facts**

Based on the testimony and the evidence submitted at the suppression hearing, the Court finds the following facts by a preponderance of the evidence. On March 7, 2014, three Kansas City, Kansas police officers—Officer Sara Panjeda, Officer Kevin Wells, and Sergeant Phillip Trusskey—were looking for Marcus Moon, a suspect in an armed robbery that had taken place a day earlier. The Kansas City, Kansas Police Department had issued a pickup order for Moon, which listed an associate, George Steen, Jr., who had an address at the Terrace Pointe Apartment complex located at 649 S. 71st Terrace, Kansas City, Kansas. The apartment complex is in a known high crime area. The officers were supplied with a photo of Moon, and they went to the apartment complex to look for Moon or Steen. They were driving two marked patrol cars—Officers Panjeda and Wells were in one, and Sergeant Trusskey was in the other—and they were in uniform.

When they arrived at 649 S. 71st Terrace, the three officers talked to a female, who informed them that Steen was not there but that he might be in a downstairs apartment at 609 S. 71st Terrace, another building in the apartment complex. The officers drove to 609 S. 71st Terrace. Sergeant Trusskey notified dispatch that they were changing locations at 3:28 p.m. When the officers pulled into the parking lot at 609 S. 71st Terrace, a red Kia Optima with Missouri license plates was backed into a parking spot in the corner of the lot, under a tree. Sergeant Trusskey radioed dispatch to run the license plate. The officers exited their vehicles and walked toward the building, with Officer Wells slightly behind the other two. Officer Panjeda testified that she could hear the Kia running, but she could not see anyone in the car.

Wells pointed out that there were two men in the car and suggested that the officers check it out to see whether the passenger was Moon.

Officer Panjeda testified that although the windows of the Kia were initially closed, Clark, who was sitting in the driver's seat, rolled his window down as the officers approached and she could smell the odor of burnt marijuana from a car stall's width away. Defendants, on the other hand, testified that the windows were closed and Officer Panjeda tapped on the driver's side window repeatedly ordering them to open it. The Court finds the Defendants' testimony in this regard to be credible. This encounter took place during the winter, and the car was running, presumably to keep the car heated. Defendants had firearms in the car, and Clark testified that he knew there was raw marijuana in the vehicle. Both Defendants had prior felony convictions. No burnt marijuana was found in or around the vehicle. For all of these reasons, the Court credits Defendants' testimony that the windows were closed when the officers approached the vehicle. The Court therefore also does not credit Officer Panjeda's testimony that she smelled burnt marijuana from a car stall's width away.[1] Officer Panjeda specifically testified that she smelled the burnt marijuana through the open driver's side window; she testified on cross-examination that she could not have smelled it through a closed window. Because the Court believes the window was closed upon the officers' approach, the Court also believes that the officers did not smell marijuana before they made contact with Defendants.

The officers approached the car with Panjeda on the driver's side, Trusskey on the passenger's side, and Wells in front of the car. The Court credits Defendants' testimony that the officers' hands were near their weapons. Officer Panjeda tapped on the driver's side window

---

[1] The Court is not suggesting that Officer Panjeda's testimony was dishonest. Rather, recognizing that this incident occurred almost two years ago, the police reports do not fully describe all the details of the incident, and Officer Panjeda has undoubtedly interacted with many other suspects since this occurred, her memory of the events is undoubtedly less clear than it was closer in time to the encounter with Defendants.

and ordered Clark to roll down the window and shut off the ignition. After numerous requests, Clark did roll down the window and he turned off the ignition. Clark handed Officer Panjeda his driver's license and then reached over and turned the ignition back on. At that point, the officers drew their weapons and pulled Defendants out of the car. They saw a gun in Clark's waistband and found another on Heard, and spotted a third gun in the car on the driver's side door. The officers handcuffed Defendants and had them in custody by 3:31 p.m. They searched Defendants and the car; on Clark's person they found two bags of raw marijuana, over $400 in cash, a cell phone, and documents, in addition to the firearm. In the car, in addition to the firearm, they found more bags of marijuana and a small bag containing cocaine, heroin, and pills. There were two more cell phones charging in the vehicle as well. The officers found a rental agreement for the car from Enterprise, which listed Delano Hutchins as the only authorized driver of the vehicle.

## II.   Discussion

### A. The Investigative Detention

The Fourth Amendment protects "[t[he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[2]  The Tenth Circuit has defined three types of police-citizen encounters:

> (1) Consensual encounters which do not implicate the Fourth Amendment;
> (2) investigative detentions which are Fourth Amendment seizures of
> limited scope and duration and must be supported by a reasonable suspicion
> of criminal activity; and (3) arrests, the most intrusive of Fourth
> Amendment seizures and reasonable only if supported by probable cause.[3]

---

[2] U.S. Const. amend. IV.

[3] *United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (citation and quotation marks omitted).

During the suppression hearing, the parties indicated that this was the second type of encounter, an investigative detention, also known as a *Terry* stop, although they disagree about when the encounter became an investigative detention. The Supreme Court has made clear that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions."[4] An encounter between police and a civilian is consensual "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business.'"[5] Where, however, a person's freedom of movement is restrained "by means of physical force or a show of authority," that individual is "seized" for the purposes of the Fourth Amendment.[6] "[I]f, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," he is seized.[7] "Examples of circumstances that might indicate a seizure . . . would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."[8]

An investigative detention, which is a less intrusive seizure than an arrest, "is justified at its inception if 'the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime.'"[9] Reasonable suspicion requires "more than an 'inchoate and unparticularized suspicion or hunch,'"[10] but the

---

[4] *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

[5] *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).

[6] *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).

[7] *Id.* at 554.

[8] *Id.*

[9] *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (quoting *United States v. Werking*, 915 F.2d 1404, 1407) (10th Cir. 1990)).

[10] *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

5

level of suspicion is less than that required for probable cause.[11]  To determine whether reasonable suspicion exists, courts look to the "totality of the circumstances, asking 'whether the detaining officer has a particularized and objective basis for suspecting wrongdoing.'"[12]

In this case, it is clear that Defendants were seized from the moment the officers surrounded the vehicle.  Defendants testified that they did not realize the officers had approached until they had already surrounded the car, with their hands near their weapons, and Officer Panjeda tapped on the window and ordered Clark to open it.  The positioning of the officers, which was undisputed in the testimony, including Wells' station in front of the car, would have caused any reasonable person in the car to believe he or she was not free to leave.

The question then becomes whether the officers had reasonable suspicion to detain Defendants.  Two cases from the Sixth Circuit present a similar scenario to the one here.  In *United States v. See*,[13] the defendant and two companions were sitting in a parked car in the parking lot of a public housing complex which was in a known high crime area.[14]  An officer was patrolling in the area and was specifically instructed to look out for people loitering, drug-related activity, loud music, and suspicious people.[15]  At 4:30 a.m., the officer was patrolling the apartment complex and saw the defendant's car backed into a spot in the parking lot with three people inside.[16]  He pulled in front of the car, blocking it in.[17]  The officer ultimately searched

---

[11] *Id.*

[12] *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

[13] 574 F.3d 309 (6th Cir. 2009).

[14] *Id.* at 311.

[15] *Id.*

[16] *Id.* at 312.

6

the car and found a firearm.[18] The district court denied Defendant's motion to suppress, holding that the officer had conducted a warrantless *Terry* stop by blocking in the car, but that he had reasonable suspicion to do so.[19] The Sixth Circuit overturned the district court's denial of Defendant's motion, determining that the officer did not have reasonable suspicion to detain the defendant.[20] Although the time of day, the fact that the apartment complex was in a high crime area, and the fact that the officer was specifically looking for suspicious people were relevant factors, the court found that they were not sufficient to establish reasonable suspicion, although the court noted that the officer could have initiated a consensual encounter with the defendant.[21] When the officer seized the occupants of the car,

> he did not suspect the men of a specific crime, he had not seen the men sitting in the car for an extended period of time, he was not acting on a tip, he had not seen the men do anything suspicious, and the men did not try to flee . . . .[22]

The Sixth Circuit case of *United States v. Gross*[23] contains facts nearly identical to those in *See*. In *Gross*, the defendant was legally parked in the parking lot of an apartment complex in a high crime area with his engine running.[24] The officer parked his patrol car directly behind the defendant's car, blocking it in.[25] The officer questioned the defendant and discovered that he

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* at 314.

[22] *Id.*

[23] 662 F.3d 393 (2011).

[24] *Id.* at 399.

[25] *Id.*

had an outstanding warrant.[26] Again, the Sixth Circuit concluded that by parking his patrol car in such a way as to block the defendant's car in its parking spot, the officer initiated a *Terry* stop for which he did not have reasonable suspicion.[27]

Similarly, although the officers in this case were looking for a suspect in a crime, they had no reason to believe Clark and Heard were the men they sought. They were not acting suspiciously, did not try to drive off when they saw the marked police cars pull into the parking lot, nor did the officers observe them sitting in the lot for a long time. The woman the officers had previously spoken to indicated Steen might be in the apartment building, but gave no indication that the officers should focus their search in the parking lot. Aside from the fact that the officers were looking for Moon, there was no reason to approach the car, and certainly not in the manner they did. The officers clearly could have approached the car and initiated a consensual encounter with Defendants; they could have asked for their identification and whether they knew Moon or Steen, as long as the Defendants were free to leave or decline to speak to the officers. But the manner in which the officers approached—surrounding the vehicle, blocking it from being able to leave, and with their hands near their weapons—immediately rendered this an investigative detention rather than a consensual encounter, for which they lacked reasonable suspicion.

### B. Fruit of the Poisonous Tree

The Government argues that Defendants lack standing to challenge the search of the rental vehicle, since neither of them was an authorized driver on the rental agreement. However, since the Court finds that Defendants were unlawfully seized, Defendants may challenge the

---

[26] *Id.* at 397.

[27] *Id.* at 401.

subsequent search as the fruit of the unlawful seizure. The Tenth Circuit has held that "although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention."[28] A defendant must make a two-part showing to suppress evidence as the fruit of an unlawful detention: first, "that the detention did violate his Fourth Amendment rights," and second, that there is "a factual nexus between the illegality and the challenged evidence."[29] If the defendant makes that showing, the government must then prove that the evidence is not the fruit of the poisonous tree, either because the evidence would have been inevitably discovered, because the evidence was discovered through independent means, or because the evidence was so attenuated from the illegal seizure that the taint of unlawful conduct was dissipated.[30]

The Court has already determined that Defendants' Fourth Amendment rights were violated when they were seized without reasonable suspicion. The next inquiry, then, is whether there is a factual nexus between the unlawful detention and the discovery of contraband. This has been further explained as a showing that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[31] It is clear to the Court that there is such a factual nexus here. Although the officer testified that she smelled burned marijuana in the car, no burned marijuana was found in or near the car. Furthermore, the officers were looking for Moon or Steen; as Officer Panjeda testified, they were not seeking to arrest

---

[28] *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (citing *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996); *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995)).

[29] *Nava-Ramirez*, 210 F.3d at 1131.

[30] *Id.*

[31] *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).

Defendants for possession of marijuana even if they did smell it in the car. If this had been a consensual encounter, it is likely from the testimony that the car would not have been searched and Defendants would not have been arrested. Therefore, the Court finds that there is a factual nexus between the unlawful detention and the search.

The Government argues that the Court must analyze whether either of the Defendants would have been able to drive away in the rental car, under the framework presented by the Tenth Circuit in *DeLuca*. In *DeLuca*, the defendant was driving a car which was owned by the passenger, Boyer. The court found that the factual nexus requirement was not met because even if DeLuca had requested and been given permission to leave the scene, the car and its owner would likely have continued to be detained and the car would still have been searched.[32] The court had previously analyzed *Nava-Ramirez* through the same framework; the defendant in that case was also driving a car which was owned by the person in the passenger's seat.[33] The court found that the defendant failed to meet his burden of proving a factual basis in that case because he did not show that he would have been able to take the car even if he had been free to leave, since its owner was still seized.[34]

This framework does not fit with the case at hand. In *DeLuca* and *Nava-Ramirez*, the reason the defendants were unable to prove a factual nexus was because even if they had been given permission to leave, they would not have had permission from the vehicle's owner, who was still seized by the police, to take the vehicles with them. Thus, the vehicles would have been searched regardless of the defendant's detention. That is not at all the situation here, and the Court finds the question of whether one of the defendants would have been able to leave with the

---

[32] *Id.* at 1133.

[33] *Nava-Ramirez*, 210 F.3d at 1130.

[34] *Id.* at 1131-32.

car to be irrelevant to this analysis. The facts of this case are very different from those that sparked the inquiry into the factual nexus in *DeLuca* and *Nava-Ramirez* because the vehicle's owner was not detained here, and because had Defendants been allowed to leave, they could have done so in the car.

Even if that analysis were relevant in this case, however, the Court finds that each of the Defendants would have been able to take the car with him if given the opportunity to leave the scene, which would have prevented the officers from searching the car. The Court therefore finds that there is a factual nexus between the violation of Defendants' Fourth Amendment rights and the search of the vehicle. Neither Clark nor Heard had an ownership interest in the vehicle. In fact, it was a rental vehicle which neither defendant was technically authorized to drive by the rental company. Rather than having to stay with an owner, therefore, if either defendant had been free to leave the parking lot, either could have taken the car. They had an equal possessory interest in the car such that the car could leave or remain with either of them. Therefore, even if the Court is required to utilize the framework laid out in *DeLuca* and *Nava-Ramirez*, Defendants are still able to prove that there was a factual nexus between the unlawful detention and the search of the car.

The burden then falls on the Government to prove that the evidence was not the fruit of the poisonous tree. This burden may be met by "demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."[35] The Government has not demonstrated that any of these doctrines apply here. Rather, the evidence was discovered as a direct result of the unlawful detention. Therefore, the proceeds of the search should be excluded as the fruit of the unlawful detention.

---

[35] *Id.* at 1131.

### C. The Government's Motion to Reopen the Suppression Hearing

The Government requests that the suppression hearing be reopened to allow it to supplement the dispatch recordings that were played by Defendants during the December 9 hearing. The recordings that were provided in discovery and played during the hearing did not include the entirety of the communications between Sergeant Trusskey and dispatch. Officer Panjeda testified that Sergeant Trusskey received a response from dispatch after he asked them to check the license plate of the vehicle, but the recorded dispatch call did not contain that response. The Government has verified that the recording played in the hearing was incomplete, and now wishes to offer the remaining part of the recording. The Government asserts that these recordings have implications for Officer Panjeda's credibility, and are thus relevant to the Court's analysis of Defendants' motion.

The Court has considered this request, and finds that the supplemental evidence would not affect its decision on Defendants' suppression motion. Although the Court does engage in credibility determinations here, the missing piece of the dispatch recording did not color the Court's credibility assessment of Officer Panjeda or of Defendants. Rather, the Court assessed the credibility of all the witnesses at the hearing based on all of the testimony and evidence, and would have reached the same conclusions even if the dispatch recording had been complete at the hearing. It is unnecessary to supplement the evidence at this stage, and the Government's motion to reopen the hearing is therefore moot.

### III. Conclusion

The evidence and testimony at the suppression hearing leads the Court to determine that the officers seized Defendants immediately upon approaching the vehicle, without reasonable suspicion of wrongdoing. The manner in which the officers approached the vehicle—

surrounding it with their hands near their weapons—immediately rendered this encounter an investigative detention.  The officers did not have reasonable suspicion to justify seizing these Defendants; they were not suspected of wrongdoing, nor had they been sitting in the parking lot for a prolonged amount of time.  The pickup order for Moon was not sufficient to allow the officers to detain just anyone with whom they came into contact that day.  They could have initiated a consensual encounter, but not an investigative detention without reasonable suspicion.  The Court finds that Defendants' Fourth Amendment rights were violated and there is a factual nexus between that violation and the evidence discovered in the search of Defendants and the vehicle.  The evidence should therefore be suppressed as the fruit of the unlawful detention.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Clark's Motion to Suppress (Doc. 64), which Defendant Heard joined (Doc. 126), is granted.

**IT IS FURTHER ORDERED** that the Government's Motion to Reopen the Suppression Hearing (Doc. 130) is denied as moot.

**IT IS SO ORDERED.**

Dated: January 8, 2016

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE